IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RHONDA J. MARTIN, *et al.*,    :
                          :

    Plaintiffs,         :

v.                            :

BRIAN KEMP, *et al.*,      :      CIVIL ACTION NO.
                          :      1:18-CV-4776-LMM

    Defendants.      :

---

GEORGIA MUSLIM VOTER   :
PROJECT, *et al.*,        :

    Plaintiffs,         :

v.                            :

BRIAN KEMP, *et al.*,      :      CIVIL ACTION NO.
                          :      1:18-CV-4789-LMM

    Defendants.      :

## ORDER

This case comes before the Court on Plaintiffs Rhonda J. Martin, Dana Bowers, Jasmine Clark, Smythe DuVal, Jeanne Dufort, and the Georgia Coalition for the People's Agenda, Inc.'s ("Electors") Amended Motion for Preliminary Injunction, Civ. A. No. 1:18-cv-4766 [hereinafter, "Martin"], Dkt. No. [19] and Plaintiffs Georgia Muslim Voter Project ("GMVP") and Asian-Americans Advancing Justice-Atlanta's ("Advancing Justice-Atlanta") Motion for Temporary Restraining Order, Civ. A. 1-18-cv-4789 [hereinafter, "GMVP"], Dkt. No. [5]. Plaintiffs seek an injunction to prevent election officials—as mere enforcers of current Georgia law—from rejecting absentee ballot applications and ballots due to an alleged signature mismatch or other technical error without pre-rejection notice, a reasonable opportunity to cure the deficiency before Election Day, and an opportunity to appeal.

All Plaintiffs seek an injunction on the basis that Georgia's statutory procedures for rejecting absentee ballot applications and absentee ballots, O.C.G.A. §§ 21-2-381, -386, infringe upon the fundamental right to vote in violation of the equal protection clause of the Fourteenth Amendment. Plaintiff Electors also allege that such procedures threaten to burden the fundamental right to vote in violation of the Fourteenth Amendment's guarantee of substantive due process. Finally, Plaintiffs GMVP and Advancing Justice-Atlanta contend that the aforementioned Georgia statutes violate the procedural due process clause of the Fourteenth Amendment to the extent they deprive absentee

ballot applicants and absentee voters of notice and an opportunity to be heard before their ballots or applications are rejected.

Because the Electors just filed a motion for preliminary injunction on Friday and an amended motion for preliminary injunction on Tuesday morning (the day of the hearing), the Court will only consider the Electors' arguments as to signature mismatch. All other Elector claims will be addressed by the Court at a later time, after Defendants have had an opportunity to be heard. <u>See</u> Order, <u>Martin</u> Dkt. No. [21] (setting a briefing schedule to resolve the Electors' Amended Motion for Preliminary Injunction). This Order will address the entirety of the <u>GMVP</u> Motion and the signature mismatch argument from the <u>Martin</u> Motion.

After due consideration and with the benefit of oral argument, the Court enters the following Order:

## I.   Background

### A. <u>Factual Summary</u>

Georgia law authorizes any eligible voter to cast his or her absentee ballot by mail. With the exception of a slight change to the oath requirement,[1] the procedures governing how county registrars verify absentee ballot applications and absentee ballots have been in place since 2007. Harvey Decl., <u>GMVP</u> Dkt. No. [24-1] ¶ 4. The first step in the absentee-voting process is for a voter to submit an

---

[1] Specifically, the oath requirement has changed to require a voter to list his or her year of birth instead of the month and day of birth. <u>See</u> Harvey Decl., <u>GMVP</u> Dkt. No. [24-1] ¶ 4.

absentee ballot application via mail, fax, email, or in person. O.C.G.A. § 21-2-381(a)(1)(A). A voter may submit an absentee ballot application as early as 180 days prior to the date of the primary or election through and including the Friday before the primary or election. Id. Absentee ballots cannot be issued the day before a primary or election. O.C.G.A. § 21-2-384(a)(1)(2).

When an absentee ballot is received, the county registrar or absentee ballot clerk must determine if the applicant is eligible to vote in the relevant primary or election by comparing the applicant's identifying information to the applicant's information on file with the registrar's office. O.C.G.A. § 21-2-381(b)(1). If the elector signed the application, the registrar must compare the elector's application signature to the elector's voter registration card signature. Id. If the registrar determines that the signatures do not match, the clerk or the board of registrars "shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ineligibility." O.C.G.A. § 21-2-381(b)(2)(3). While there is no procedure by which an elector can contest the registrar's decision, the statutes do not prevent an elector whose application is rejected from applying a second time or voting in person. In Gwinnett County, when a voter's application for an absentee ballot is rejected, the Gwinnett County Board of Registrations and Elections ("BORE") sends a letter by first-class mail within three days of the rejection along with a written explanation of why the ballot was rejected, a new application, and an

explanation of other ways the individual can cast his or her vote. Ledford Decl.,

<u>GMVP</u> Dkt. No. [23-1] ¶ 7.

If a voter's eligibility is confirmed, the registrar must mail an absentee

ballot to the voter. O.C.G.A. § 21-2-381(b)(2)(A). When an absentee voter receives

an official absentee ballot, they receive two envelopes. O.C.G.A. § 21-2-384(b).

The voter must place the completed absentee ballot in the smaller of the two

envelopes. <u>Id.</u> The smaller envelope must then be placed in the larger envelope,

which contains the oath of the elector and a line for the elector's signature.

O.C.G.A. § 21-2-384(b)-(c). All absentee ballots must be received by 7 p.m. on

Election Day to be counted. O.C.G.A. § 21-2-386(a)(1)(F).

Upon receipt of each absentee ballot, the registrar or clerk must once again

compare the elector's oath signature or mark made on the outside of the envelope

with the signature or mark on the absentee elector's voter registration card.

O.C.G.A. § 21-2-386(a)(1)(B). A ballot will be rejected "[i]f the elector has failed

to sign the oath, or if the signature does not appear to be valid, or if the elector

has failed to furnish required information or information so furnished does not

conform with that on file . . . or if the elector is otherwise found disqualified to

vote[.]" O.C.G.A. § 21-2-386(a)(1)(C). The clerk shall write "Rejected" across the

face of the envelope, provide the reason for rejection, and "promptly notify the

elector of such rejection." <u>Id.</u>

An elector whose ballot is rejected pursuant to O.C.G.A. § 21-2-386(a) may

vote in the primary or election by either applying for a second absentee ballot at

least two days prior to the election or primary, or voting in person through early absentee voting or at the elector's polling place on the day of the election or primary. Ga. Comp. R. & Regs. 183-1-14-.09. Consistent with these regulations, within three days of a rejection, Gwinnett County provides a voter with a letter stating the reasons for rejection, a new application for an absentee ballot, and information on how to vote in person through early or Election Day voting. Ledford Decl., <u>GMVP</u> Dkt. No. [23-1] ¶ 14.

However, before an absentee ballot is rejected for mismatched signatures in Gwinnett County, the Gwinnett County Director of Registration and Elections, Lynn Ledford, reviews the questioned ballot. <u>Id.</u> ¶ 15. If she is unable determine whether the signatures match, she meets with two other senior staff members to determine by a majority vote whether the ballot is certified. <u>Id.</u> Staff members at BORE do not have access to voter history information when reviewing absentee ballot applications and cannot access voter history information when checking for statutorily required information on an absentee ballot application or absentee ballot envelope. <u>Id.</u> ¶ 9.

There is no procedure by which an elector can contest a registrar's decision that the signatures do not match. By contrast, an elector whose absentee ballot is rejected on grounds that the elector is unqualified to vote is provided with notice, a hearing "on an expedited basis prior to the certification of the consolidated returns of the election," and given an opportunity to appeal to the board of

registrars, as well as further opportunity for judicial appeal. O.C.G.A. §§ 21-2-229, -230(g).

County election directors are reporting an increase in the volume of absentee by-mail voting and absentee in-person (early) voting for the upcoming general election. Harvey Decl., GMVP Dkt. No. [24-1] ¶ 7. Indeed, Defendant Gwinnett County reports that it has received "significantly" more absentee ballot applications for the upcoming election than in previous years. Ledford Decl., GMVP Dkt. No. [23-1] ¶ 20. Plaintiff Electors contend that the recently publicized dangers associated with voting in person using Georgia's paperless Direct Recording Electronic ("DRE") machines has led candidates from all parties to encourage Georgia citizens to vote absentee by mail, thereby greatly increasing the number of voters casting their ballots by mail.

Plaintiffs GMVP and Advancing Justice-Atlanta allege that at least 493 absentee ballot applications and nearly 100 absentee ballots have been rejected due to signature mismatch thus far for the 2018 general election. Ali Decl., GMVP Dkt. No. [5-3] ¶ 7. With regards to Gwinnett County, Plaintiff Electors argue that absentee voters in Gwinnett County are more likely than absentee voters outside Gwinnett County to have their absentee ballots rejected. Martin Dkt. No. [1] ¶ 44. Specifically, Plaintiff Electors allege that as of October 12, 2018, Gwinnett County had rejected 9.6%[2] of all absentee mail ballots, while DeKalb County had only

---

[2] Plaintiff Electors allege that 391 of 4,063 ballots were rejected as of October 12, 2018 in Gwinnett County. Of these 391 rejected ballots, Plaintiff Electors note

rejected 1.9% and Fulton County had rejected none. Id. Plaintiff Electors also argue that in addition to Gwinnett County's comparatively high rate of rejection, the percentage of ballots rejected by Gwinnett County varies by race and ethnic group—for example, Plaintiff Electors allege that 171 black voters' ballots were rejected while only 66 white voters' ballots were rejected; similarly, Plaintiff Electors note that while Asian and Pacific Islanders made up approximately 15% of the mail ballot voters as of October 12th, they made up 25% of the mail ballot rejections. Id. ¶ 45.

Defendant Gwinnett County explains that as of Thursday, October 18th, BORE has rejected a total of 713 absentee ballot applications. Ledford Decl., GMVP Dkt. No. [23-1] ¶ 10. Of these ballot application rejections, 185 were rejected due to signature mismatch; 437 because required information was missing; 7 because the elector was found to be disqualified; and 84 because the elector chose to vote in person during early voting. Id. Further, as of October 18th, BORE has rejected a total of 524 absentee ballots. Id. ¶ 18. Of those 524 rejections, 9 ballots were rejected because of signature mismatch; 209 because the oath was not signed; and 306 because required information was missing. Id.

## B. Relief Requested

Plaintiffs GMVP and Advancing Justice-Atlanta request that election officials provide rejection notice for both absentee ballot applications and

---

that 128 were rejected because the year of birth was missing or mistakenly filled in as the current year.

absentee ballots within one day of a signature mismatch rejection. These Plaintiffs also ask that voters whose absentee ballots are rejected be given an opportunity to resolve and appeal a signature discrepancy pursuant to the existing procedures set forth in O.C.G.A. § 21-2-230(g) within three days of Election Day or three days after receiving pre-rejection notice, whichever is later. For ballot application rejections, Plaintiffs GMVP and Advancing Justice-Atlanta ask that voters also be permitted to avail themselves of the notice and opportunity procedures in O.C.G.A. § 21-2-230(g) up until the Friday before Election Day. See GMVP Dkt. No. [5] at 2-3.

The Elector Plaintiffs further request that the Court order election officials to determine the eligibility of each mail ballot application and mail ballot within three business days of receipt and, within one business day of finding an application deficient, to (1) send the applicant via first-class mail a written notice of rejection, a new application, and instructions to cure; and (2) call and email the applicant (provided the applicant has supplied the necessary information) to inform the applicant of the grounds of ineligibility and instructions to cure. They also ask that such notification include instructions for tracking the status and progress of an application and ballot issuance on the Secretary of State's website. See Martin Dkt. No. [19] at 10 (providing the Electors' requested form deficiency notice).[3]

---

[3] As stated supra at 3, the Electors also seek additional relief, which the Court will consider in the future.

## II.    Legal Standard[4]

The standard for obtaining a temporary restraining order ("TRO") is identical to that of obtaining  a preliminary injunction. <u>Windsor v. United States</u>, 379 F. App'x 912, 916-17 (11th Cir. 2010). To obtain a preliminary injunction, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) granting the injunction would not be adverse to the public interest. <u>Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.</u>, 320 F.3d 1205, 1210 (11th Cir. 2003). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." <u>United States v. Jefferson Cty.</u>, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting <u>Canal Auth. v. Callaway</u>, 489 F.2d 567, 573 (5th Cir. 1974)).

## III.    Discussion

Defendants make a variety of challenges to Plaintiffs' requested injunction. Specifically, Defendants assert: (1) Plaintiffs do not have standing; (2) Plaintiffs' claims should be barred by laches; (3) Plaintiffs cannot bring a facial challenge to

---

[4] The Court recognizes that Plaintiff Electors seek a preliminary injunction while Plaintiffs GMVP and Advancing Justice-Atlanta seek a temporary restraining order.

these statutes; and (4) Plaintiffs have not established the four injunction factors. The Court will consider each argument in turn.

### A. <u>Standing</u>

Defendants first argue that Plaintiffs do not have standing to bring their claims. Article III standing requirements are threefold:

> First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. Second, the injury must have been caused by the defendant's complained-of actions. Third, the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision.

<u>Fla. State Conference of NAACP v. Browning</u>, 522 F.3d 1153, 1159 (11th Cir. 2008) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61 (1992)). Where only injunctive relief is sought, only one plaintiff with standing is required. <u>Crawford v. Marion Cty. Election Bd.</u>, 472 F.3d 949, 951 (7th Cir. 2007), <u>aff'd</u>, 553 U.S. 181 (2008); <u>see also</u> 553 U.S. at 189 n.7 (expressly agreeing with the Seventh Circuit's finding on this point).

The <u>GMVP</u> Plaintiffs have asserted direct standing under an organizational standing theory. In their Response, Defendants challenge those Plaintiffs' ability to satisfy the first and third standing requirements.[5] Specifically, Defendants

---

[5] Though not challenged by Defendants, the Court notes that the individual voter Plaintiffs in <u>Martin</u> have established standing because any burden on their ability to vote that is not imposed on other voters, no matter how slight, is an injury sufficient to confer standing. <u>See</u> <u>Common Cause/Ga. v. Billups</u>, 554 F.3d 1340, 1351-52 (11th Cir. 2009); <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>, 408 F.3d 1349, 1352 (11th Cir. 2005). Plaintiffs have sufficiently alleged that other absentee voters whose mail ballots are challenged on the basis of the voters' qualifications

assert that Plaintiffs Advancing Justice-Atlanta and GMVP cannot establish a concrete and particularized injury sufficient to support direct organizational standing absent a showing that they will have to divert resources to warning voters about the potential risks of filing absentee ballots. GMVP Dkt. No. [23] at 14. Further, Defendants contend that even if Plaintiffs' proffered evidence is sufficient to confer standing under a resource-diversion theory, Plaintiffs have failed to show how an injunction would redress the harm alleged because they would be required to expend the same or additional efforts to inform voters of the new procedures required by the injunction. Id. at 15-16.

An organization must show an impediment of its mission or diversion of its resources as a basis for standing if it seeks to sue on its own behalf. See Browning, 522 F.3d at 1158, 1164-66. In their Motion for Temporary Restraining Order, GMVP Plaintiffs provided declaration evidence that they will have to divert more resources to "warning voters about th[e] risk" of signature mismatch rejections and to "following up with voters to explore any possibility of ensuring that their ballot will be counted, such as placing calls to county registrars or expending more resources towards facilitating in-person voting to compensate

---

are given an opportunity to be heard on such challenge before any final determination is made not to count their ballots. See O.C.G.A. § 21-2-230(g). No such hearing procedure is granted to absentee voters whose mail ballots are rejected on the basis of a signature mismatch. While these voters may be able to vote another way or submit a new mail ballot, the rejected ballot is never counted. O.C.G.A. § 21-2-381(b)(2)(3). Further, the injury is fairly traceable to the Martin Defendants' enforcement and implementation of these state election laws and redressable by the relief sought.

for the risk of absentee ballots not being counted." <u>GMVP</u> Dkt. Nos. [5-2] ¶¶ 3-4, [5-3] ¶¶ 4-5. Defendants argue that this evidence is not sufficient to create direct organizational standing because "Plaintiffs have not explained how those activities differ from what they categorize as their 'regular voting and voter registration activities' in which their organizations already engage." <u>GMVP</u> Dkt. No. [23] at 14. However, Defendants conceded during oral argument that Plaintiffs' additional affidavit evidence submitted the day prior likely suffices to meet the injury requirement. <u>See</u> <u>GMVP</u> Dkt. Nos. [25-1, 25-2]. The Court agrees.

The Eleventh Circuit's opinion in <u>Browning</u> is instructive here given its numerous factual similarities to the case at hand. There, organizational plaintiffs including the Florida NAACP, the Southwest Voter Registration Education Project ("SVREP"), and the Haitian-American Grassroots Coalition challenged a Florida statute on several grounds, including the due process clause. 522 F.3d at 1158. The Florida statute set forth a new verification process for first-time voter registrants in the state, requiring each applicant to provide either the applicant's driver's license number or the last four digits of his or her Social Security number. <u>Id.</u> at 1156. Before the application could be accepted, the Florida Department of State had to verify or match the number provided in the application with the number assigned to the applicant's name by the relevant agency. <u>Id.</u> In the event of a mismatch, the voter registration was not completed, and the applicant was notified of the rejection through the mail. <u>Id.</u> at 1156-57.

Ultimately, the Eleventh Circuit held in <u>Browning</u> that the organizational plaintiffs had both direct and associational standing. <u>Id.</u> at 1160-66. On direct standing, the Eleventh Circuit cited with approval the Seventh Circuit's <u>Crawford</u> opinion for the propositions that "an organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'" <u>Id.</u> at 1165 (quoting <u>Crawford</u>, 472 F.3d at 951). Thus, following the Seventh Circuit's reasoning, the Eleventh Circuit similarly held that the organizational plaintiffs had made a sufficient showing of an imminent concrete injury where they "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance with [the Florida statute] and to resolving the problem of voters left off the registration rolls on election day." <u>Id.</u> at 1165-66.

In arguing that <u>GMVP</u> Plaintiffs have not presented sufficient resource-diversion evidence, Defendants in their brief correctly note that the Eleventh Circuit in <u>Common Cause</u> discussed evidence from the organizational plaintiff that it had to divert resources from efforts that were part of its mission to efforts to assist voters in obtaining photo identification. <u>GMVP</u> Dkt. No. [23] at 15 (citing <u>Common Cause</u>, 554 F.3d at 1350-51). However, Defendants cite to no authority that an organizational plaintiff *must* explain exactly how its resources will be diverted from one endeavor to another before sufficient injury can be shown. For

14

example, in <u>Browning</u>, the Eleventh Circuit found that the SVREP plaintiff made a sufficient showing that it would suffer a concrete injury based only on its "anticipat[ion] that it will expend many more hours *than it otherwise would have* conducting follow-up work with registration applicants because voters will have their applications denied due to matching failures." 522 F.3d at 1166 (emphasis added). <u>See also</u> <u>Arcia v. Fla. Sec'y of State</u>, 772 F.3d 1335, 1341-42 (11th Cir. 2014).

Here, Plaintiffs Advancing Justice-Atlanta and GMVP have both alleged that, in light of news articles reporting high absentee ballot rejection rates in Gwinnett County in particular, they "must now divert more resources towards warning voters about" the risk of a signature mismatch. Plaintiff Advancing Justice-Atlanta further noted "higher rates of rejection especially among Asian Americans." Cho. Decl., <u>GMVP</u> Dkt. No. [5-3] ¶ 4. Moreover, both <u>GMVP</u> Plaintiffs have provided additional affidavits from the Executive Director of GMVP and Deputy Director of Advancing Justice-Atlanta, which provide thoroughly detailed accountings of the specific activities from which the organizations have had to divert resources to address absentee ballot rejection concerns. These activities include, *inter alia*, phone banking, finding canvassing volunteers, in-person and written "get-out-the-vote" efforts (which Advancing Justice-Atlanta conduct in five different languages), preparing for and facilitating voter education forums to educate community members on what will appear on their ballots and on issues that impact them, facilitating a candidate forum,

preparing for an upcoming fundraiser and grant-writing efforts, and translating educational materials. GMVP Dkt. Nos. [25-1, 25-2]. This declaration evidence is sufficient to show that the organizations were compelled "to divert more resources to accomplishing [their] goals[,]" which the Eleventh Circuit has held is enough to confer standing even where the added cost has not been estimated and may be slight. Browning, 522 F.3d at 1165. Therefore, the GMVP Plaintiffs have met their burden of establishing a concrete and particularized injury under the organizational standing rubric.

The Court also finds Defendants' redressability arguments unavailing. If the requested injunction is granted, *the State* will be required to implement procedures necessary to satisfy procedural due process. In other words, the organizational Plaintiffs will not bear the same burden of assisting and warning voters once the State is required to assist voters whose ballots are challenged as illegitimate and once the urgency of warning voters is diminished by way of due process protections. Therefore, standing is established.

## B. Laches

Defendants next argue that Plaintiffs' injunction request is barred by the equitable doctrine of laches. GMVP Dkt. No. [24] at 15-18. The affirmative defense of laches requires a defendant to prove three things: "(1) there was a delay in asserting a right or claim, (2) the delay was not excusable, and (3) the delay caused [a defendant] undue prejudice." United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005) (citing AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1545

(11th Cir. 1986)). As such, the applicability of laches is dependent on the specific facts of a case. See Coca-Cola Co. v. Howard Johnson Co., 386 F. Supp. 330, 334 (N.D. Ga. 1974) ("Whether laches bars an action depends on the circumstances of the particular case. . . .") (citation omitted); Studiengesellschaft Kohle mbH v. Eastman Kodak Co., 616 F.2d 1315, 1325 (5th Cir. 1980) ("Laches and estoppel are equitable defenses whose appropriateness must be determined in each case under its particular factual situation.")(citations omitted).

Here, Defendants contend that Plaintiffs' delay was unreasonable given that the statutes at issue have been part of Georgia's election code for over fifteen years, and that Plaintiffs nevertheless waited until after the start of the 2018 general election to file suit. GMVP Dkt. Nos. [23] at 25-26; [24] at 15. Relying heavily on the Fourth Circuit's decision in Perry v. Judd, Defendants urge this Court not to "upend the orderly progression of state electoral processes at the eleventh hour." 471 F. App'x 219, 220-21 (4th Cir. 2012); GMVP Dkt. No. [24] at 16-17. But while Defendants correctly note that—despite over a decade of use— the challenged statutes have never been questioned, weighing on the other side of equitable scale is the notion that, given the fact-sensitive nature of a laches inquiry, courts have been hesitant to bar claims under a laches defense when there is limited factual information available. See Espino v. Ocean Cargo Line, Ltd., 382 F.2d 67, 70 (9th Cir. 1967) ("[T]he factual issues involved in a laches defense can rarely be resolved without some preliminary evidentiary inquiry."); see also Jeffries v. Chi. Transit Auth., 770 F.2d 676, 679 (7th Cir.

1985) ("Laches is generally a factual question not subject to summary judgment.").

At this early juncture, the Court does not find Plaintiffs' delay inexcusable. Indeed, Plaintiffs offer several patently reasonable explanations for the timing of their suits—for example, Plaintiffs GMVP and Advancing Justice-Atlanta contend that they filed suit in response to the October 12, 2018 news article highlighting the apparent magnitude of the issue in Gwinnett County. GMVP Dkt. No. [25] at 11. In a similar vein, Plaintiff Electors allege that applications for absentee ballots have surged in the wake of the recent and highly-publicized litigation over the reliability of the DRE voting system, thereby highlighting and exacerbating the purported issues. Martin Dkt. No. [10] ¶ 3. Accordingly, the Court is not persuaded that Plaintiffs' delay in bringing suit was inexcusable.[6] See, e.g.,

---

[6] Nor does the Court find merit in Defendants' assertion that entering injunctive relief this close to an election will seriously disrupt the electoral process, resulting in significant prejudice to both Defendants and the public. Indeed, multiple courts within the Eleventh Circuit have granted injunctive relief against election officials in close temporal proximity to an election despite recognizing the administrative burden inherent in such relief. See, e.g., Fla. Democratic Party v. Detzner, No. 4:16-cv-607-MW/CAS, 2016 WL 6090943, at *9-*10 (N.D. Fla. Oct. 16, 2016) (granting a preliminary injunction 22 days before the 2016 general election to provide voters with the opportunity to cure signature mismatch on absentee ballots); Ga. Coal. for the Peoples' Agenda, Inc. v. Deal, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) (entering an injunction extending the voter registration deadline in Chatham County less than thirty days before the 2016 general election while also acknowledging that "the extension would present some administrative difficulty."); Common Cause/Ga. v. Billups, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) (enjoining Georgia's voter photo identification requirement shortly before the November 2005 municipal election in spite of the "inconvenience and expense that entering a preliminary injunction may work upon the State").

SunAmerica Corp. v. Sun Life Assur. Co. of Can., 77 F.3d 1325, 1345 (11th Cir. 1996) (Birch., J., concurring) (in determining whether delay is "excusable," a court must not "limit itself solely to a raw calculation of the time period involved . . . the court should also examine the *reasons* for any delay."). Laches does not bar Plaintiffs' injunction request.

### C. **Whether Plaintiffs May Bring a Facial Challenge**

Defendant Kemp contends that, while the GMVP Plaintiffs purport to bring both facial and as-applied procedural due process challenges to the statutory provisions at issue, the Court should only consider the facial challenge because Plaintiffs have "failed to identify a *single* voter to whom these statutes have been unconstitutionally applied." GMVP Dkt. No. [24] at 18. Further, Defendant Kemp argues that because the statutes would not disenfranchise a hypothetical elector who applied for an absentee ballot well in advance of the election and was provided rejection notice with sufficient time and ability to cure with a corrected ballot, Plaintiffs cannot prove that the law would be "unconstitutional in all of its applications." Id. at 19 (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)).

Because Plaintiffs have not identified a voter to whom these statutes have been unconstitutionally applied, the Court agrees that Plaintiffs' objection to Georgia's absentee voting procedures should be construed as a facial challenge. See id. The Supreme Court has "articulated two formulations of the standard for

assessing facial challenges to statutes." <u>Libertarian Party of N.H. v. Gardner</u>, 843 F.3d 20, 24 (1st Cir. 2016).

In <u>United States v. Salerno</u>, the Supreme Court held that a facial challenge can only succeed where a plaintiff "establishes that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). More recently, the Supreme Court explained that "a facial challenge must fail where the statute has a plainly legitimate sweep." <u>Wash. State Grange</u>, 552 U.S. at 449 (internal quotation and citation omitted). The Eleventh Circuit recently cited the latter formulation in the context of a facial procedural due process challenge. <u>See</u> <u>J.R. v. Hansen</u>, 803 F.3d 1315, 1320 (11th Cir. 2015) ("<u>Hansen II</u>") ("A plaintiff challenging a law as facially unconstitutional 'must establish that no set of circumstances exists under which the law would be valid.'" (quoting <u>Horton v. City of St. Augustine</u>, 272 F.3d 1318, 1329 (11th Cir. 2001))).

But Plaintiffs' procedural due process challenge survives under either standard. The Court need not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." <u>Wash. State Grange</u>, 552 U.S. at 450. Rather, the written terms of the statute dictate the procedure. <u>J.R. v. Hansen</u>, 736 F.3d 959, 966 (11th Cir. 2013) ("<u>Hansen I</u>") ("In facial due process challenges, we have looked to the statute as written to determine whether the procedure provided comports with due process."). An absentee voter whose ballot application or ballot is rejected is "promptly" notified of such rejection, but the voter is neither provided with a hearing nor an opportunity to appeal the

20

registrar's decision. O.C.G.A. §§ 21-2-381, -386. Because the statute at issue leaves no room for discretion in its application, the procedures provided are apparent from the statutes' facial terms. See, e.g., Gardner, 843 F.3d at 24; see also Boddie v. Connecticut, 401 U.S. 371, 375 (1971) (explaining that procedural due process hinges on the "guarantee that one may not be deprived of his rights, neither liberty or property, without due process of law."). Thus, the Court can readily ascertain from the statute, as written, whether the procedures therein comport with due process and a facial challenge is appropriate. In other words, the opportunity to be heard either is—or is not—provided by the statute on its face. That is the subject of a facial challenge and the Court's next inquiry.

### D. Merits

The Court will first consider whether Plaintiffs have established a substantial likelihood of success on the merits of their procedural due process claims, before turning to the remaining injunction factors.

#### 1. *Procedural Due Process*

Under the law of the Eleventh Circuit, a § 1983 claim alleging a procedural due process denial requires proof of three elements: (1) a deprivation of a constitutionally protected liberty interest; (2) a state action; and (3) constitutionally inadequate process. Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). In this case, the second element is not in dispute. Defendants do, however, vigorously contest Plaintiffs' likelihood of success on the remaining elements.

Defendant Kemp first objects to Plaintiffs' contention that the challenged statute deprives registered voters of their constitutionally-protected liberty interest in the right to vote. GMVP Dkt. No. [24] at 22. Defendants correctly note that there is no federal constitutional right to vote by absentee ballot. Id. (citing McDonald v. Bd. of Election Comm'rs of Chi., 394 U.S. 802, 807-08 (1969)). Accordingly, Defendants aver that procedural due process protections apply only to the extent that the State of Georgia has conferred the right to vote by absentee ballot through the process set forth in the Georgia Election Code. GMVP Dkt. No. [24] at 24.

The Court disagrees. Courts around the country have recognized that "[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege." Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F. Supp. 1354, 1358 (D. Ariz. 1990); see also Zessar v. Helander, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. 2006) ("approved absentee voters are entitled to due process protection."). While Defendants correctly assert that the right to apply for and vote via absentee ballot is not constitutionally on par with the fundamental right to vote, once the state creates an absentee voting regime, they "must administer it in accordance with the Constitution." Zessar, 2006 WL 642646, at *6. Indeed, the Supreme Court has long held that state-created statutory entitlements can trigger due process. See Goldberg v. Kelly, 397 U.S. 254, 262 (1970); Paul v. Davis, 424 U.S. 693, 710-12 (1976). Having created

an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection.

The remaining question is whether Georgia's absentee ballot statute provides adequate process. See Grayden, 345 F.3d at 1232. "To determine what process is due, courts turn to the test from Mathews v. Eldridge, which requires the balancing of a number of considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Hansen I, 736 F.3d at 966 (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). In addition, the Mathews Court implored courts to recognize that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 U.S. at 344.

Here, the Court agrees with Plaintiffs that the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight. GMVP Dkt. No. [5-1] at 13. Given that the State has provided voters with the opportunity to vote by absentee ballot, the State must now recognize that the "privilege of absentee voting is certainly 'deserving of due

process.'" Saucedo v. Gardner, No. 17-cv-183-LM, 2018 WL 3862704, at *10 (D.N.H. Aug. 14, 2018) (quoting Raetzel, 762 F. Supp. at 1358).

Turning to the second factor, Defendants contend that "the procedures used minimize the risk of erroneous deprivation . . . [and] provide for prompt notice and an ability to cure the deficiency." GMVP Dkt. No. [24] at 32. At oral argument, Defendants further averred that the risk of erroneous deprivation is not high—indeed, in Gwinnett County only nine absentee ballots have been rejected due to signature mismatch thus far. Ledford Decl., GMVP Dkt. No. [23-1] ¶ 18. Plaintiffs respond that the risk of a voter's absentee ballot application or ballot being erroneously rejected is substantial, given that a single election official—who is not trained in handwriting analysis—has unchecked discretion to determine whether two signatures match. GMVP Dkt. No. [5-1] at 16; see also Saucedo, 2018 WL 3862704, at *11 (recognizing that "the task of handwriting analysis by laypersons . . . is fraught with error."). Further, Plaintiffs note that the existing cure option is illusory, particularly for the category of voters who cannot vote in person due to physical infirmity. See id. at *12. There is simply no guarantee that such voters' signatures might match on a second absentee ballot or absentee ballot application. While the Court recognizes that the risk of an erroneous deprivation is by no means enormous, permitting an absentee voter to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement. See, e.g., Zessar, 2006 WL 642646, at *9 ("It is apparent that the risk of erroneous deprivation of the protected interest in

absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote."). Accordingly, the probative value of additional procedures is high in the present case.

The third and final factor in the <u>Mathews</u> balancing test asks the Court to examine the government's interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. Here, without doubt, Defendants have a strong interest in maintaining the integrity of elections. Defendants assert that additional procedures are not only burdensome but also unnecessary, as the "simple verification of identify can be accomplished by the voter simply showing up at the county election office." <u>GMVP</u> Dkt. No. [24] at 32. But as the Court has already recognized, there is a category of absentee voters who vote by mail because they physically cannot show up in person. And Defendants cannot cry foul with regard to the burden of additional procedures given that Defendants conceded at oral argument that counties already permit voters to verify their signatures through extrinsic evidence on an ad hoc basis.

As a final note, the Court also finds that the additional procedures impose a minimal burden on Defendants because the statute elsewhere already provides notice, a hearing, and an opportunity to appeal for absentee voters whose ballots are challenged for ineligibility. <u>See</u> O.C.G.A. §§ 21-2-229(e), -230(g), -419; <u>see also</u> <u>Zinermon v. Burch</u>, 494 U.S. 113, 137 (1990) ("we cannot say that

postdeprivation process was impossible . . . [where the state] already has an established procedure."). Defendants fail to explain why it would impose a severe hardship to afford absentee voters a similar process for curing mismatched signature ballots as for curing qualification challenges or casting a provisional ballot. Compare Detzner, 2016 WL 6090943, at *8 ("There is no reason that same procedure cannot be implemented (rather, re-implemented) for mismatched-signature ballots."). Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens while still furthering the State's asserted interest in maintaining the integrity of its elections. See Saucedo, 2018 WL 3862704, at *13 ("[A]dditional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised.").

In light of the foregoing, the Court finds that Plaintiffs have established a substantial likelihood of success on the merits of their procedural due process claims.[7]

### 2.  Remaining Injunction Factors

The Court also finds that the remaining injunction factors weigh in Plaintiffs' favor. The Court finds that Plaintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and,

---

[7] Because the Court finds that an injunction is warranted on the signature mismatch issue pursuant to procedural due process requirements, the Court declines to also decide whether an injunction would be warranted on this same issue pursuant to a substantive due process or equal protection violation.

26

once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes. See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1289 (11th Cir. 2013) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable.")(collecting cases); see also League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

And the Court finds that the balance of equities and the public interest support an injunction. With respect to their hardship, Defendants essentially argue that it would be unduly burdensome to employ a new procedure this close to the election and that Plaintiffs should have brought their actions sooner. By changing the procedures this close to the election, Defendants argue, the integrity of the election process will be put into question. But Defendants' arguments at the hearing undermine those points.

Preliminarily, the Court does not understand how assuring that all eligible voters are permitted to vote undermines integrity of the election process. To the contrary, it strengthens it. Second, Defendants argue that the signature mismatch

27

rejection is "rare"—only 0.017% of all accepted absentee ballots in 2016 were rejected on that basis. See Harvey Decl., GMVP Dkt. No. [24-1] ¶ 11. But that statistic only bolsters Plaintiffs' argument that any additional, constitutionally mandated processes will not be an administrative burden. For instance, according to the Secretary of State's online system—which the State readily admits is not accurate as not all counties track absentee ballot rejection numbers through it—only 228 signature match rejections have occurred statewide. See McDonald Decl., Martin Dkt. No. [16] at 11. The State cannot claim on one hand that an appeal process would be an administrative nightmare while on the other claiming that such a rejection is rare.

And finally, because the Court is ordering Defendants to provide an opportunity to be heard by essentially adopting the provisional ballot process, O.C.G.A. § 21-2-419, see infra, election officials will not have to divert resources to conduct informal, identification-confirmation hearings until after the election. In the interim, election officials will only have to additionally provide provisional ballots—which are on the same form as absentee ballots—to ballot applicants with signature mismatches. This, coupled with drafting a new rejection letter which outlines the Court's mandated procedures, is not so burdensome as to outweigh Georgians' right to vote. See Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is

undermined."). Plaintiffs have established all four prerequisites to warrant injunctive relief.

## IV.   Conclusion

Plaintiffs have shown they are entitled to an injunction on the signature mismatch issue. The Court proposes entering the below injunction. As the parties have not had an opportunity to be heard on the exact terms of the Court's proposal, the parties have until noon on Thursday, October 25, 2018, to provide the Court with any objections to the form. Any objections should not exceed 10 pages. The Court is specifically interested in comments as to whether any of the below language is confusing or will be unworkable for the implementing officials. This is not meant to be an opportunity to readdress the propriety of entering the injunction—only its form. The Court will then take into account the parties' comments and immediately enter an injunction similar to that proposed below.

### <u>Proposed Injunction</u>

The Secretary of State's Office shall issue the following instructions to all county boards of registrars, boards of elections, election superintendents, and absentee clerks:

1) All county elections officials responsible for processing absentee ballots shall not reject any absentee ballots due to an alleged signature mismatch. Instead, for all ballots where a signature mismatch is perceived, the county elections official shall mark this ballot as provisional. <u>See</u> O.C.G.A. § 21-2-419. The county elections official shall then provide pre-rejection notice

and an opportunity to resolve the alleged signature discrepancy to the absentee voter. This process shall be done in good faith and is limited to confirming the identity of the absentee voter. This process shall be done no later than three days following the election. The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in O.C.G.A. § 21-2-229(e).

2) All county elections officials responsible for processing absentee ballot applications shall not reject any absentee ballot application due to an alleged signature mismatch. Instead, for all ballot applications where a signature mismatch is perceived, the county elections official shall, in addition to the procedure specified in O.C.G.A. § 21-2-381(b), provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. The outer envelope of the absentee ballot provided shall be marked provisional. Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.

3) This injunction should apply to all absentee ballot applications and absentee ballots with designated signature mismatches submitted in this current election. This injunction does not apply to voters who have already cast an in-person vote.

**IT IS SO ORDERED** this 24th day of October, 2018.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE