IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RHONDA J. MARTIN, *et al*,

      Plaintiffs,

vs.

BRIAN KEMP, SECRETARY OF
STATE OF GEORGIA, *et al.*,

      Defendants.

Civil Action No.: 1:18-cv-04776-LMM

## DEFENDANTS STEPHEN DAY, JOHN MANGANO, ALICE O'LENICK, BEN SATTERFIELD, AND BEAUTY BALDWIN'S RESPONSE IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION[1]

Defendants are members of the Gwinnett County Board of Registrations and Elections ("Gwinnett BORE"). Per this Court's other orders, the Gwinnett BORE has already responded to a motion for temporary restraining order regarding the absentee ballot process in *Ga. Muslim Voter Project v. Kemp*, Case No. 1:18-cv-04789-LMM (the "GMVP Case"). Because there are several common issues in the two cases, the Gwinnett BORE incorporates its response in the GMVP Case,

---

[1] Plaintiffs' Amended Motion for Preliminary Injunction, [Doc. 19], was filed on October 23, 2018. By order of the Court later that same day, all Defendants were directed to file response briefs by noon on Monday, October 29, 2018. [Doc. 21]. This brief is being filed on the timeline specified by the Court.

including the Declaration of Lynn Ledford (attached as Exs. A and B to this document).

Plaintiffs' amended motion [Doc. 19] does not contain argument about the basis for a preliminary injunction, but rather a list of the specific relief sought. The Gwinnett BORE will respond to the legal arguments raised in the original brief in support of Plaintiffs' first motion [Doc. 4] (which has been denied as moot), their hearing brief [Doc. 18], and several of the Notices filed in this case [Doc. 16].

## **INTRODUCTION**

This Court should not grant the proposed injunction because the equities do not favor a massive change in the absentee ballot process only days from the end of the 45-day period for absentee-by-mail voting and because the proposed injunction is not in the public interest. The harms alleged by Plaintiffs in this action are completely different than the harms alleged in the GMVP Case. In *GMVP*, this Court expressed concerns that someone could sign their name on an absentee ballot or application ten times and never match what was on file. In sharp contrast, a voter who fails to sign his or her ballot oath or places the wrong date in the "birth year" section required by statute has made an error the voter has the opportunity to correct by filling out the oath correctly or voting in person.

Given the remediable nature of failing to fill out the oath and birth year correctly and the massively disruptive changes to the absentee balloting process proposed by Plaintiffs, the Gwinnett BORE strongly urges this Court not to enter the injunction sought by Plaintiffs, especially because the last day for absentee ballots to be sent to voters is this Friday.

## ADDITIONAL FACTUAL BACKGROUND

While many of the facts in dispute align with the facts raised by the plaintiffs in the GMVP Case, a few additional issues raised by this case require clarification.

**I. The security of electronic voting is not at issue in this case.**

Each of the Plaintiffs explains his or her concerns about the security of electronic voting machines, which are completely unrelated to the issues in this case. Whether Georgia will change its voting system for the 2018 election was already resolved by an earlier ruling from Judge Amy Totenberg in *Curling v. Kemp*, Case No. 1:17-CV-2989-AT, slip op. at 45 (N.D. Ga. September 18, 2018). In *Curling*, Judge Totenberg determined that it was too late in the election process to change the voting systems in use in the state and that the plaintiffs were not entitled to a preliminary injunction. *Id*. at 44.

**II. Not every county uses the Secretary of State's eNet system, so comparisons to other counties are not relevant to the issues raised by Plaintiffs.**

As Director Ledford and Elections Director Chris Harvey noted, not every county inputs its absentee balloting information into eNet, which provides an explanation for why almost 80 counties on Plaintiffs' spreadsheet are shown as having rejected no ballots (including Chatham, Fulton, Hall, Henry, Richmond, and Rockdale Counties). Ex. B, ¶ 16; [Doc. 25-1, at ¶ 4]; [Doc. 7, pp. 9-11[2]]. Even Plaintiff Martin expresses concerns about a rejection rate of zero and speculates that rejections are not being reported through the public system. [Doc. 4-1, p. 51 at ¶ 7].

Plaintiffs rely heavily on the apparent disproportionate effect of differing rejection rates as the basis for singling out Gwinnett County and alleging that the "disparate impact" is critically important for their fundamental right to vote claim. *See* [Doc. 4-1, pp. 9-11], [Doc. 18, pp. 8-9, 19-20]. But these disparities are not the effect of malfeasance or arbitrariness—they are the result of a lack of information.[3] This is also why the entirety of the declaration submitted by Dr. McDonald is not

---

[2] Many of Plaintiffs' pleadings have different page numbers on the top and bottom of each page. For consistency, the Gwinnett BORE uses the top page number as the page number of each document referenced.

[3] Plaintiffs' speculation that the Gwinnett BORE is rejecting ballots based on racial bias [Doc. 4-1, p. 10] is untrue and offensive. *See* Ex. B, ¶¶ 3, 12 (no racial information displayed when comparing ballots to registration records).

relevant to this case, because it was based solely on the reports available through eNet. *See* [Doc. 16, pp. 7-8].

Plaintiffs do not know how many ballots have been rejected by other counties because of the lack of reporting by those counties and thus cannot conclude that Gwinnett County is "responsible for 32.2 percent of absentee ballots rejected statewide." [Doc., 18, p. 20]. Secretary Kemp has no ability to force reporting by county election superintendents, but Gwinnett fully reports its absentee ballot processing. Ex. B, ¶ 16.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs have failed to establish the third and fourth prongs of the preliminary injunction standard.[4] They have not shown that the equities favor the relief they seek and they have not shown that an injunction is in the public interest. As in the GMVP Case, the Gwinnett BORE does not take a position on the constitutionality of the challenged statutes. But this Court should not enter the relief sought at this late hour in the election process, especially given the disruptive nature of the proposed changes. This Court should also reject Plaintiffs' claims

---

[4] In order to obtain a preliminary injunction, Plaintiffs must show they (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

based on lack of standing because they have not shown their alleged injuries are

traceable to any action by the Gwinnett BORE or remediable by a favorable ruling.

**I. The disruptive relief sought by Plaintiffs is not favored by the equities and is not in the public interest.**

Gwinnett mailed its first absentee ballots to voters on September 21, 2018,

which is 45 days from Election Day. O.C.G.A. § 21-2-384(a)(2); Ex. B, at ¶ 11.

Absentee ballots cannot be mailed to voters after the Friday before Election Day.

O.C.G.A. § 21-2-384(a)(2). As a result, the deadline for absentee ballots to be

mailed for the 2018 general election is this Friday, November 2, 2018. *Id.*

Gwinnett County is currently operating eight early voting sites, providing

more than a thousand hours of in-person voting opportunities for its residents prior

to Election Day. Gwinnett County wants to ensure every eligible voter can cast a

ballot and does this consistent with the state's interest in ensuring an orderly and

fair election. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006).

> *A. The balance of equities does not favor Plaintiffs because of the significant impact Plaintiffs' proposal would make on both the operations of the Gwinnett BORE and Gwinnett voters.*

A court weighing the equities of a proposed injunction must "balance the

competing claims of injury" and consider the "public consequences" of an

injunction. *Winter*, 555 U.S. at 24. A court should consider the harm the applicant

is likely to suffer with the harm the opponent will suffer if an injunction is

imposed. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). In this case, following this Court's signature-matching order, the relative impact to the Plaintiffs is minor contrasted with the massive harm to the Gwinnett BORE if Plaintiffs are granted their proposed relief.

While Plaintiffs frame their potential harm in terms of the fundamental right to vote, now that the Court has ordered a new signature-matching process [Docs. 23, 26], the only way Plaintiffs could suffer harm at this point is a rejection of their absentee ballots if they fail to fill out the form correctly.[5] If Plaintiffs carefully read and fill out the form, there is no basis for the Gwinnett BORE (or any other election superintendent) to reject their ballots.

In contrast, the Gwinnett BORE would face a massive disruption if forced to implement the remedies outlined by Plaintiffs. As Director Ledford explained, all poll worker training has already concluded. Ex. B, ¶ 26. Election officials do not have any additional ballot boxes available at polling sites to collect absentee ballots dropped off by voters—the only boxes in use are boxes for provisional ballots. Ex. B, ¶ 26. Every political party and independent candidate has the opportunity to designate poll watchers by tomorrow, *see* O.C.G.A. § 21-2-408(b),

---

[5] While Plaintiffs make reference to a theoretical difficulty of a voter reading the application or oath, the same exhibit cited shows the voter may have assistance filling out his or her ballot. [Doc. 4-1, p. 8].

and the Gwinnett BORE is unsure exactly what relief Plaintiffs are requesting about the poll watcher process. [Doc. 19-1, p. 5]. In addition, Gwinnett County is the only Georgia county covered by Section 203 of the Voting Rights Act, meaning that all forms and letters, such as those proposed by Plaintiffs [Doc. 19-1, pp. 9-10], must be translated before being placed in use. *See* U.S. Census, *Section 203 of the Voting Rights Act: Covered Areas for Voting Rights Bilingual Election Materials,* https://www.census.gov/content/dam/Census/newsroom/press-kits/2017/esri/esri_uc2017_voting_rights_act.pdf.

The relief Plaintiffs propose would require this Court to rewrite the entirety of the absentee ballot statutes to give effective direction to election superintendents. The birth year is one of the pieces of information used to identify the voter who is casting the absentee ballot. O.C.G.A. § 21-2-386(a)(1)(C). This Court would have to provide guidance about what to do if various parts of the oath were left blank, or if the oath was unsigned, or if the address matched publicly available information but not other information on the voter's file, or if someone assisting a voter had not properly filled out the assistance oath. This Court would have to provide guidance to officials about when to utilize the birth year for identification or fraud prevention and when to find it is unnecessary.

And the potential universe of individuals involved is far larger. The Gwinnett BORE has rejected over 1,500 applications and ballots for a variety of reasons and taking the time of election officials to address those rejections is far more complex than the approximately 300 applications and ballots rejected due to signature mismatch.

Plaintiffs are asking for a completely reinvented and new process that has never been used in Georgia—unlike the relief sought in the GMVP Case.[6] There is no statute to use as a template for potential relief, because no such process exists for how to process a "cure affidavit," nor is there a process to accept absentee ballots at every precinct. Eliminating the birth-year requirement and other requirements of eligibility determinations also undermines the state's interest in avoiding fraud in elections. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353-55 (11th Cir. 2009).

In the GMVP Case, this Court expressed concerns that someone could sign their name ten times and never match what was on file. A voter who fails to sign

---

[6] The Declaration of Amber McReynolds is not helpful to the Court in this case, because she describes a state system based on mandatory mail-in ballots with limited in-person voting opportunities [Doc. 7, p. 22 at ¶ 9]. While her suggestions may be good options for the Georgia General Assembly to consider in the future, this Court cannot rely on her input to rewrite the absentee ballot statutes at this point in the election process, in part because Georgia's system is not staffed like a primarily mail-in state.

his or her ballot oath or places the wrong date in the "birth year" section has made an error that is correctable and has the opportunity to correct that error by filling out the oath correctly. That is as true for a homebound voter as a voter who is able to vote in person.

When comparing the fact that the absentee-by-mail period (that is 45 days long) will be effectively over in four days when the last ballots go out and the massive impact on the operations of Gwinnett County with the only burden on voters being that they must fill out a form correctly, the equities do not favor an injunction.

*B. The proposed injunction does not serve the public interest.*

Courts should use their discretion to deny injunctions that work a "chaotic and disruptive effect upon the electoral process," because they are not in the public interest. *See Fishman v. Schaffer*, 429 U.S. 1325, 1330, 97 S. Ct. 14 (1976); *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1945, 201 L. Ed. 2d 398 (2018). There is a significant public interest in ensuring orderly elections and the purpose of a preliminary injunction is to preserve the status quo—not to rewrite a statute on the eve of an election. *Benisek*, 138 S.Ct. at 1945; *Purcell*, 549 U.S. at 4-5.

Plaintiffs have not shown that the proposed injunction is in the public interest. As Director Ledford explained, the potential for voter confusion is immense if the rules are changed now. Ex. B, ¶ 22. Voters who were previously rejected have resubmitted applications and possibly submitted new ballots. Election officials will have to determine whether to utilize the later or earlier ballot. While the Gwinnett BORE is doing this for the limited category of ballots and applications with signature mismatch rejections, broadening the scope would place a massive burden on overtaxed election officials a week out from the election. Ex. B, ¶¶ 20-21.

The proposed injunction is also not in the public interest because Plaintiffs have not exercised reasonable diligence in placing these matters before the Court. *Benisek*, 138 S. Ct. at 1943-44. Plaintiffs have not shown that any new information was needed before bringing this lawsuit. Plaintiffs even admit in their brief that their calculation of Gwinnett's rejection rate for absentee ballots in the general election is almost identical to the rejection rate in the May 2018 primary—five months ago. [Doc. 4-1, pp. 8-9]. But Plaintiffs did not even file this action until the first day of in-person early voting, after two-thirds of the time for absentee balloting had already elapsed, then did not seek a preliminary injunction until four

days later, and continued to evolve their theories and briefing after that point.
[Doc. 1, Doc. 4, Doc. 16, Doc. 18].

Plaintiffs' own words also demonstrate their lack of diligence in bringing
this case. Their declarations show that they placed their hope in changes to the
electronic voting system, [Doc. 4-1, pp. 28-29 (Bowers), 33-34 (Clark), 44-45
(Duval), 50-51 (Martin)], and, when those changes did not occur, decided to bring
this action next—and still waited almost a month before doing so. The sole case
cited by Plaintiffs to support the concept that this injunctive relief is in the public
interest granted an injunction to maintain the status quo, not to change the process
used. *Casarez v. Val Verde Cty.*, 957 F. Supp. 847, 866 (W.D. Tex. 1997).

Plaintiffs have not demonstrated how overturning a statute that has been in
effect for years, when almost all of the time for absentee ballots has elapsed, in a
way that will cause significant disruption to the work of election officials, will
serve the public interest. Plaintiffs have not exercised reasonable diligence and
their request for a preliminary injunction should be denied. *Benisek*, 138 S.Ct. at
1944.

**II. Plaintiffs do not have standing because they have not alleged any harm that is traceable to the actions of the Gwinnett BORE or redressable by a favorable ruling.**

While this Court already found the individual plaintiffs in this case have standing [Doc. 23 at p. 11 n.5], the Gwinnett BORE has not yet had an opportunity to respond in opposition to the Plaintiffs' claimed standing in this lawsuit. Even if Plaintiffs have pleaded an injury in fact,[7] that is not the end of the standing analysis—they must also meet the other elements. Plaintiffs' alleged injury must also be "fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743, 2752 (2010); *United States v. Hays*, 515 U.S. 737, 742-743, 115 S.Ct. 2431 (1995) *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct. 2130 (1992). This is because federal courts may only hear "actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312 (1997).

---

[7] At the hearing on October 23, counsel for the Gwinnett BORE conceded that the new declarations filed by the plaintiff organizations in the GMVP Case had sufficiently pleaded the first prong of a standing analysis: alleging an injury-in-fact. But the Gwinnett BORE continued to contest the second and third prongs, that the plaintiff organizations did not show a traceable injury and that the harm they alleged was not redressable by a favorable ruling.

*A. Plaintiffs have not shown their injury is traceable to any action by Gwinnett County.*

An alleged injury alone is not enough to establish standing. Plaintiffs must also show an injury that is "*certainly* impending" and traceable to the challenged action. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138 (2013) (emphasis in original). A mere belief that there is a connection is not enough. *Id.* The Supreme Court found that, even though the plaintiffs in *Clapper* had a good-faith, non-paranoid belief that they would be surveilled by the challenged government program, they did not have standing, because they could not show any injury traceable to the challenged conduct. *Id.* at 415-416.

Even if Plaintiffs have alleged a sufficient injury, none of the Plaintiffs can show that any injury is fairly traceable to the actions of the Gwinnett BORE.

### 1. The individual plaintiffs cannot trace an impending injury to the actions of the Gwinnett BORE.

Only two of the individual Plaintiffs reside in Gwinnett County, Dana Bowers and Jasmine Clark. [Doc. 4-1, p. 27 at ¶ 1 (Bowers), p. 32 at ¶ 1 (Clark)]. Ms. Clark indicated that she plans to vote on voting machines in person on Election Day and is not even attempting to use the absentee ballot process. [Doc. 4-1, p. 34 at ¶ 8]. Thus, any injury to Ms. Clark's right to vote is not traceable to the absentee balloting process, let alone the actions of the Gwinnett BORE.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (plaintiff

must be harmed in a "personal and individual way"). Ms. Bowers says she plans to

vote by absentee ballot, but has not yet applied for an absentee ballot. [Doc. 4-1, p.

29 at ¶ 8]; Ex. B at ¶ 24. While both Ms. Clark and Ms. Bowers purport to speak

for other individuals as part of campaigns,[8] litigants must "assert his or her own

legal rights and interests and cannot rest a claim to relief on the legal rights or

interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364

(1991); *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994).

The challenged statutes only require action by county election

superintendents, not any state officials. *See* O.C.G.A. §§ 21-2-381(b), 21-2-386.

For that reason alone, none of the plaintiffs who reside in counties besides

Gwinnett can trace any alleged injury to any conduct of the Gwinnett BORE,

because their county's election superintendents will administer the absentee ballot

process if they choose to use it. Because Gwinnett County is the only county

election superintendent named in this lawsuit, only one individual plaintiff can

even remotely trace her injury to the actions of the Gwinnett BORE—because only

one plaintiff in this case who plans to vote by absentee ballot resides in Gwinnett

County.

---

[8] To the extent the campaigns seek to claim organizational standing, they should be
plaintiffs to this action and make appropriate allegations.

But even Ms. Bowers cannot trace a harm to the actions of the Gwinnett

BORE because any such harm is pure speculation. The Eleventh Circuit explained

that "the Supreme Court has 'repeatedly reiterated that "threatened injury must be

*certainly impending* to constitute injury in fact" and that "[a]llegations of *possible*

future injury" are not sufficient.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198,

1202 (2018) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis

in original). Given the fact that (1) only Ms. Bowers could even remotely trace

conduct of the Gwinnett BORE to any potential injury, (2) Ms. Bowers can avoid

all injury by filling out her form correctly, (3) Ms. Bowers will not be injured in an

unreviewable way if she fills out her form correctly (because signature matching is

no longer an issue), and (4) any injury is not certainly impending because she has

not yet even requested an absentee ballot, this Court should find that all of the

individual plaintiffs lack standing to bring this action against the Gwinnett BORE

based on the record before the Court.

### 2. The Ga. Coalition for the People's Agenda cannot trace an impending injury to the actions of the Gwinnett BORE.

The Georgia Coalition for the People's Agenda (the "Ga. Coalition") makes

the same arguments about diversion of resources made by the organizational

plaintiffs in the GMVP case.[9] Even if the Ga. Coalition has alleged an injury, it has not shown that its diversion of resources is traceable to any actions of the Gwinnett BORE.

In the sole declaration supporting standing, the Ga. Coalition describes its existing "Pews to the Polls" Program as an effort to help voters obtain an absentee ballot, then follow up with those voters to help ensure their ballot is cast. [Doc. 16, p. 37 at ¶¶ 9-13]. That program was in place well before any issue was raised regarding the challenged statutes. [Doc. 16, p. 36 at ¶¶ 5, 7]. The Pews to the Polls program is apparently mostly complete, with voters placing their ballots in the mail more than a week ago. [Doc. 16, p. 38 at ¶ 15]. If ballots are rejected, the Ga. Coalition will apparently engage in its normal process for following up and assisting voters. [Doc. 16, p. 38 at ¶ 13]. Ms. Butler was only able to identify two individuals in all of the churches that participate in the Pews to the Polls program who reside in Gwinnett County. [Doc. 16, p. 39-40 at ¶ 20].

While the Ga. Coalition claims the Gwinnett BORE's rejection of absentee ballots has "caused a drain on the GCPA's resources," [Doc. 16, p. 40 at ¶ 22], it does not explain with any specificity how running an existing program that assists

---

[9] There appears to be no basis for associational standing, given that the Coalition refers to itself as an "umbrella" organization that only has other organizations as members as opposed to having individual members. [Doc. 16, p. 35 at ¶ 3].

voters has caused any impact on the Ga. Coalition's operations.[10] But even if it has alleged a sufficient injury, the claimed lower participation and following up with voters who live outside of Gwinnett County [Doc. 16, pp. 40-41 at ¶¶ 22-23] is not fairly traceable to the actions of the Gwinnett BORE. Only two voters in the entire program even reside in Gwinnett County—every other voter at issue resides in a county where the election superintendent will make a separate decision. There is no harm that is "*certainly* impending," *Clapper*, 568 U.S. at 409, and the Eleventh Circuit is clear that a plaintiff "cannot bootstrap the cost of detecting and challenging the illegal practices into injury for standing purposes." *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).

Most of the Eleventh Circuit's decisions on organizational standing came before *Clapper*, but all of those cases were readily able to identify a traceable harm connected to the actions of the named defendant. In *Browning*, it was a new voter verification requirement that had not yet been used in an election, where some voters had been wrongly rejected by the defendant. *Browning*, 522 F.3d at 1157-58. In *Common Cause/Georgia*, it was helping voters obtain photo identification in a challenge to the state's new photo identification law. *Common Cause/Georgia v.*

---

[10] The alleged diversion of resources from "voter registration drives" [Doc. 16, p. 42 at ¶ 27] is not a sufficient basis for standing at this point, because voter registration ended on October 9, 2018. Ex. B, at ¶ 6.

*Billups*, 554 F.3d 1340, 1353-55 (11th Cir. 2009). In *Ga. Latino Alliance for Human Rights*, it was the cancellation of citizenship classes to address inquiries about a new immigration law. *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F. 3d 1250, 1260 (11th Cir. 2012). In *Arcia*, it was a new list maintenance program from the state. *Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1340 (11th Cir. 2014).

Each of those cases is completely unlike the alleged basis for the Ga. Coalition to have standing in this case, especially to challenge a law that has been in use for years. (This is even more true when the organization claiming the harm has an executive director who is a member of a county election board and says she is "familiar with Georgia's statutory requirements for requesting, applying for, casting, and counting or rejecting absentee ballots." [Doc. 16, p. 36 at ¶ 5].) Under their theory, an umbrella organization that does not have individual members of its own has standing if it alleges (1) that the decision by one county election superintendent to follow an existing law about which the organization is very familiar will (2) lead to lower participation by thousands of voters *outside* that county, (3) leading to the organization having to expend funds to implement an already-existing program. That diversion of funds is not even as traceable as the expenditure of the plaintiffs in *Clapper*, where the standard proposed was that the

purchase of a plane ticket based on a "nonparanoid fear" would be a sufficient diversion of resources to confer Article III standing. *Clapper*, 568 U.S. at 416. The Supreme Court found such internal decisionmaking was not traceable to the challenged actions and this Court should not lower Article III standing for such a nontraceable harm for the Ga. Coalition.

   *B. Plaintiffs' injuries are not redressable by a favorable ruling.*

   In order to determine if a plaintiff's injuries are redressable, a court must consider whether deciding in the plaintiff's favor would increase the likelihood "that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010). This is obviously connected with the traceability analysis, because the relief must directly address the injury suffered.

   If this Court grants the injunction sought by Plaintiffs, the only claimed injury alleged by the single voter who plans to vote by absentee ballot in Gwinnett County would not have her injury redressed. Ms. Bowers would still have to apply for an absentee ballot and properly fill out the form. There is no risk of her ballot being rejected for a signature mismatch without an opportunity to cure and the only effect of the injunction at this point would to allow Ms. Bowers to fill out the form

incorrectly and still have her ballot counted. Ms. Bowers' proposed relief does not directly address her alleged injury.

The only possible remedy for the Ga. Coalition is spending less resources on an existing program that is mostly complete. While this Court found that redressability was not a concern for the organizational plaintiffs in the GMVP case because the state would have to provide education [Doc. 28, p. 16], Plaintiffs in this case have expressed their own belief that an injunction will require the expenditure of *more* resources. Specifically, Plaintiff Bowers states that an injunction by this Court will require campaigns to spend even more money. [Doc. 4-1, p. 29, ¶ 9] ("the campaigns I am involved with will devote resources to contacting voters and helping them cure their ballot envelope information or mail ballot applications"). To the extent anyone is claiming a harm based on diversion of resources, Plaintiff Bowers' statement that resources will be diverted if this Court enters an injunction shows that this Court should preserve the status quo and not change the rules near the end of the absentee balloting process.

**III. This Court should not order any relief as to the Gwinnett BORE because the other 158 counties in Georgia would not be bound.**

Plaintiffs proposed order [Doc. 19-1] places affirmative duties on the Defendants to determine eligibility of ballots and applications, make contact with voters in certain circumstances, and accept delivery of ballots at 156 precinct

locations instead of the main voting office. Ex. B, ¶ 2. But the only named defendant with the ability to carry out any of the activities in the proposed injunction is the Gwinnett BORE. No other county elections officials are named and, unlike the Plaintiffs in *Ga. Muslim Voter Project*, the Plaintiffs in this case are not seeking a class action[11] or guidance from the Secretary of State. [Doc. 19-1]. Thus, the remedy suggested by Plaintiffs would change the absentee ballot rules for only one county in Georgia, despite Plaintiffs' own beliefs that there are many counties with varying approaches to absentee ballots and where Gwinnett County has only the ninth-highest rejection rate according to their calculations from eNet. [Doc. 7, p. 9].

The proposed injunction is so sweeping that it will require far more than just guidance from the Secretary of State—Gwinnett will need to obtain additional ballot boxes, retrain staff, and begin an immediate review of every rejected application and ballot for application of a brand-new process with just days before the election.

---

[11] If Plaintiffs seek to enjoin all county election officials regarding the implementation of the challenged statutes, which they apparently seek to do [Doc. 18, p. 9], they have failed to join parties necessary for the relief they seek. Fed. R. Civ. P. 19(a)(1)(A), *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999).

Election systems in the United States must avoid "arbitrary and disparate treatment to voters." *Bush v. Gore*, 531 U.S. 98, 107, 121 S. Ct. 525, 531 (2000). Changing the rules for absentee ballots this late in the process in a single county based on the relative lack of evidence presented by Plaintiffs invites disparate treatment.

## <u>CONCLUSION</u>

Plaintiffs in this case are seeking to rewrite the election process after the election machinery was well underway. Given the dramatic changes sought and the impact on the ongoing election, the equities do not favor Plaintiffs and changing the rules at this point is not in the public interest. Plaintiffs also have not shown they have injuries that are fairly traceable to the actions of the Gwinnett BORE. This Court should deny the motion for preliminary injunction and preserve the existing Georgia election processes.

I certify that this brief has been prepared in a Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

Respectfully submitted this 29th day of October, 2018.

/s/ Bryan P. Tyson
Frank B. Strickland
Georgia Bar No. 687600
fbs@sbllaw.net
Bryan P. Tyson
Georgia Bar No. 515411
bpt@sbllaw.net
Anne W. Lewis
Georgia Bar No. 737490
awl@sbllaw.net
STRICKLAND BROCKINGTON
   LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street NE
Atlanta, GA 30309
(678)347-2200

RICHARD A. CAROTHERS
Georgia Bar No. 111075
richard.carothers@carmitch.com
Brian R. Dempsey
Georgia Bar No. 217596
Brian.dempsey@carmitch.com
CAROTHERS & MITCHELL, LLC
1809 Buford Highway
Buford, GA 30518
(770) 932-3552

*Attorneys for Stephen Day, John Mangano,
Alice O'Lenick, Ben Satterfield, and Beauty
Baldwin*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

RHONDA J. MARTIN, *et al.*,

      Plaintiffs,

vs.

BRIAN KEMP, SECRETARY OF
STATE OF GEORGIA, *et al.*,

      Defendants.

Civil Action No.: 1:18-cv-04776-LMM

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that I have this date electronically filed the foregoing **DEFENDANTS STEPHEN DAY, JOHN MANGANO, ALICE O'LENICK, BEN SATTERFIELD, AND BEAUTY BALDWIN'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Bruce Brown
Richard Carothers
Cristina Correia
Brian Dempsey
Danielle Lang

- 25 -

Anne Lewis

John Powers

Bryan Sells

Frank Strickland

Russ Willard

This 29th day of October, 2018.

/s/ Bryan P. Tyson

Bryan P. Tyson

Georgia Bar No. 515411